**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| FOX LAKE LIFESTYLE DEVELOPMENT, AN ILLINOIS LLC, )<br><br>Plaintiff, )<br>v. )<br><br>BANKIOWA, AN IOWA  STATE CHARTERED COMMUNITY BANK, JAMES C. TIEMANNN, INDIVIDUALLY, A NEBRASKA RESIDENT AND OWNER OF AND DBA TIEMANN  CO., TIEMANN CO., A NEBRASKA SOLE PROPRIETORSHIP,  MICHAEL STESSMAN , INDIVIDUALLY, AN IOWA RESIDENT, THE SHERIFF OF LAKE COUNTY, AND JOHN VRATSINAS INDIVIDUALLY, AND JOHN VRATSINAS COMMERCIAL BUILDERS INC., dba JVC BUILDERS, Defendants. ) | FILED: APRIL 2, 2009<br>09CV2041<br>JUDGE MANNING<br>MAGISTRATE JUDGE VALDEZ<br>CH |

<u>**COMPLAINT**</u>

FOX LAKE LIFESTYLE DEVELOPMENT, LLC, an Illinois Limited Liability

Corporation in good standing (hereafter FOX LAKE), by and through its attorneys, ARNOLD

and KADJAN and L. STEVEN PLATT, complaining against BANK IOWA, a State of Iowa

State Chartered Community Bank, and JAMES C. TIEMANNN, individually, a Nebraska

resident and owners of and dba TIEMANN CO., a Nebraska sole proprietorship, TIEMAN

CO., a Nebraska sole proprietorship,  MICHAEL STESSMAN , individually, an Iowa resident,

the SHERIFF OF LAKE COUNTY and JOHN VRATSINAS, individually, and

JOHN VRATSINAS COMMERCIAL BUILDERS INC., dba JVC BUILDERS  complains as

follows:

## STATEMENT OF FACTS

### A. The Parties

**1.  Fox Lake Lifestyle Development LLC**

1.    The plaintiff, FOX LAKE is an Illinois, domestic, Limited Liability Corporation in good standing formed in Illinois on November 2, 2006 to develop a parcel of property in Fox Lake, Illinois.

**2.  BANKIOWA**

2.    Defendant BANKIOWA is a state chartered community bank, chartered by the state of Iowa, with its principal place of business and corporate headquarters located in West Des Moines, Iowa.

3.    Defendant BANKIOWA was formerly was known as Farmers State Savings Bank.

4.    It was incorporated in Independence, Iowa, in February of 1921.

5.    Defendant maintained steady growth in the years that followed and by 1991 had offices in Independence, Jesup, and Lamont, Iowa.

6.    As a result of that growth, defendant, BANKIOWA, became the largest financial institution in Buchanan County, Iowa, with total assets over $100,000,000.

7.    In March of 1997 defendant purchased two banking facilities in Black Hawk County, Iowa, increasing the bank's assets to over $180,000,000.

8.    With newly acquired offices in Waterloo and Cedar Falls, the defendant bank now served five different communities in Iowa.

9.      In December of 1997, defendant purchased the Benton County Savings Bank in Norway, Iowa and expanded into Benton and Linn counties in Iowa.

10.     In June of 1998, defendant Farmers State Savings Bank changed its name to BANKIOWA.

11.     The name change was made to eliminate identity and marketing confusion with other Iowa banks named "Farmers Bank."

12.     Defendant BANKIOWA'S first Cedar Rapids location was constructed in the spring of 1999 and a second facility followed in August of 2001.

13.     By 2007, defendant BANKIOWA had ten facilities in seven Iowa communities and at the end of 2007 had assets of over $410,000,000.

14.     Currently, defendant BANKIOWA serves 21 Iowa communities in 25 locations throughout the State of Iowa and its headquarters is located at its branch bank in West Des Moines, Iowa.

**3.      JAMES C. TIEMANN Individually and dba TIEMANN CO. and TIEMANN CO.**

15l     JAMES C. TIEMANN is a Nebraska resident.

16.     He has been sued here in his individual capacity and dba TIEMANN CO.

17.     On information and belief he is the sole owner of TIEMANN CO. and operates dba TIEMANN CO. (hereafter JAMES C. TIEMANN and TIEMANN CO. are collectively referred to as TIEMANN).

18.     TIEMANN CO. at one time was known as J.C. TIEMANN CONSTRUCTION CO, and was a Nebraska Corporation in good standing.

19.     It was incorporated on July 1, 1975 as J.C. TIEMANN CONSTRUCTION CO.

20.     However, it was dissolved by the Nebraska Secretary of State on August 13, 1976 for non-payment of taxes.

21.     It was revived on December 20, 1976 and issued a Certificate of Revival.

22.     It was dissolved again on August 2, 1977 for non-payment of taxes.

23.     It was revived again on June 29, 1983 and issued a Certificate of Revival.

24.     It was dissolved again on April 16, 1985 for non-payment of taxes.

25.     It has remained an "inactive" corporation since that time through the present.

26.     TIEMANNN CO. is its successor in interest and is a sole proprietorship which operates as a construction company located at with its principal place of business and headquarters at 801 N. 7th, Beatrice NE 68310.

**4.     MICHAEL STESSMAN  Individually**

27.     MICHAEL STESSMAN  is an Iowa resident who lives at 16915 Winston Circle, Clive, IA 50325

28.     He was the principal or general manager of the plaintiff Fox Lake Lifestyle Development LLC.

29.    He was and remains an individual investor in the LLC had most of the direct dealings with defendant BANKIOWA and all of the subcontractors.

30.    At all times he acted as an individual and in his individual capacity.

31.    He was retained to work as a general manager for the plaintiff LLC in his own personal and individual capacity and not as agent for or in the name of any corporation or entity.

**B.    <u>The Construction Loan</u>**

32.    At some point in the first part of 2007, defendant BANKIOWA was engaged to act as the plaintiff's agent in loaning and disbursing the proceeds of a construction loan to be used to acquire and develop the property located at 80 and 100 S. U.S. Highway 12, in Fox Lake, IL (hereafter "the subject property").

33.    On or about May 18, 2007, defendant BANKIOWA closed on construction loan number 30517 regarding plaintiff's development of the subject property.

34.    On information and belief, the loan was for property acquisition and construction purposes only and was authorized in an amount of up to $5.1 million dollars.

35.    As a general rule, defendant BANKIOWA, on information and belief, failed in its oversight of the construction loan and in administering the loan in the following particulars:

    a.    they did not have a construction inspector on site to verify that requests for funds (draws) were legitimate;

b.      they did not have an inspector on site to check to make sure material was on site and that the contractors were following construction plans;

c.      they did not alternate on-site inspectors at the job site;

d.      they did not have a supervisor of the on-site job inspector occasionally perform a review inspection to ascertain that inspections were reliable;

e.      before disbursement of funds, loan administration did not match inspection reports to draws;

f.      the defendant bank did not compare loan draws with construction plans to ensure that work was progressing accordingly;

g.      the defendant bank administration repeatedly and continuously authorized cash disbursements directly into the LLC checking account;

h.      the defendant bank administration did not make checks payable on the draws jointly to the LLC and the supplier or subcontractors;

i.      there was no comparison of any paid bills and materialmens' lien wavers with draws to be certain that the loan funds were paying for actual expenses;

j.      the defendant bank did not compare progress from draws with construction plans to ensure that they were not funding cost overruns without due consideration;

k.      some of the lump sum draws did not match the draw requests submitted by the LLC;

l.      they never required copies of contracts between the LLC and the intended payment recipients;

m.      they never required nor did they generally receive sworn statements from contractors and subcontractors indicating that the work they were being paid for had in fact been done;

n.      they never asked for nor did they generally receive any construction progress photos;

o.      they never asked for nor did they generally receive any sworn or unsworn progress statements from any project manager or engineer;

p.      they didn't make on-site visits to the job site to verify that construction work was being performed as claimed;

q.      they made regular draw deposits into the LLC account without any checks and balances to see to it that the intended recipients were in fact being paid; and

r.      they didn't follow regularly established banking procedures for disbursing the construction loan in question;

s.      they lent money to the LLC based on personal guarantees of certain members which they knew when they obtained them were virtually worthless;

t.      they granted the loan even though they knew up front that the people they were lending to were unsophisticated and inexperienced in the field of real estate development;

u.      they didn't pay the contractors and subcontractors with joint party or two-party checks;

v.      they didn't do any construction payout hold backs, holding back some of the payment to make sure the project manager or general contractor or owner was satisfied with the work before dispersing the final payment;

w.      they didn't pay the real estate taxes on the subject property directly or electronically, or when they paid it through third parties, didn't check to make sure the third parties had in fact, used the money to pay the real estate taxes as required;

x.      they paid on invoices due on the beginning of construction, proposals and projections, not on invoices for work already done; sometimes they paid without any invoices at all;  and

y.      on information and belief, they lied to bank examiners in December of 2008, and classified the subject loan as "performing" when they were calling representatives of the LLC in November of 2008, threatening to foreclose on the loan.

36.     Draw number one on the loan was for $2,952,454.

37.     Of the amount consisting of the first draw, on information and belief, without knowledge and without the approval and authority of the plaintiff, the defendant Bank used, $361,175.00 of the construction loan proceeds to pay off STESSMAN'S personal debts out of the of the first draw of the construction loan, debt that had absolutely nothing to do with the construction and development of the subject property.

38.     As a sophisticated multimillion dollar bank, defendant knew or should have known that this expense was unauthorized as it had nothing to do with the project at hand, yet it made this payment anyway.

39.     Draws 2 through 16, both inclusive, were transferred from bank funds and
deposited in the LLC's account at the bank, which was, with the bank's knowledge, under the
sole control and authority of MICHAEL STESSMAN .  The bank assumed that checks would
be written from that account to pay the vendors and contractors who were the intended
recipients of the drawn funds, but never verified that those payments were made and never
required receipts from those who were supposed to receive payments.

40.     On May 23, 2007, in its second construction loan draw, the defendant bank paid
out $31,000 for "construction management" when no construction was in fact being done on
the subject property and the defendant bank made no effort whatsoever to verify that
construction activity was in fact taking place.

41.     On May 31, 2007, the defendant bank paid $157,000 as draw number three.

42.     The draw documents called for payment of:

a.     $100,000 for Holiday Inn plans and specs

b.     $12,000 to GASA Engineering

c.     $31,000 to the Nathaniel Group Development Construction
         Management

d.     $14,500 to DKA Design

43.     On information and belief there never were any "Holiday Inn Plans" even
though $100,000 was drawn to pay for them, and the defendant bank made no effort

whatsoever to verify that such plans were in fact in existence or that they cost $100,000. On information and belief this money was never paid to Holiday Inn for Plans.

44.     On information and belief, there was no supporting documentation calling for the payment of only $14,500 to DKA Design, only documentation for $5,000, and there was no effort on the part of the bank to examine or reconcile this discrepancy; they just deposited the money in the LLC account.

45.     On July 18, 2007, the defendant bank paid draw number four in the amount of $102,920.07.

46.     Included in this draw amount, was an intended payment in the amount of $29,425.07 in real estate taxes on the subject property.

47.     STESSMAN  never used this money to pay the real estate taxes even though he provided the defendant bank with a phony "receipt" stamp dated August 1, 2007 on the tax bill after-the-fact purporting to show that the taxes had been paid.  The Lake County, Illinois, Treasurer's office does not use a paid stamp; that office prints out a written receipt.

48.     On information and belief, the defendant bank made no effort to pay these taxes directly, or electronically or to verify after-the-fact that they had, in fact been paid.

49.     On September 7, 2007, the defendant bank issued lump sum draw number seven in the amount of $64,135, which included an intended payment of $29,425 for real estate taxes, second installment, to be used to pay the 2nd Installment real estate taxes on the subject property; that amount was disbursed to the LLC checking account, which the bank knew was

under the sole and absolute control of Michael STESSMAN. On information and belief, this payment was not made by STESSMAN to the intended recipient.

50.    After STESSMAN failed to make the tax payment and on information and belief, the defendant bank failed to make any reasonable effort whatsoever, to verify whether the tax payment had in fact been made.

51.    On October 5, 2007, the defendant bank issued draw number nine, in the lump sum amount of $216,364.

52.    Included in this amount was an intended payment in the amount of $6,500 for "Prelim Site Work" when in fact, on information and belief, no such site work had ever been done.

53.    The defendant bank, on information and belief, made no effort to verify whether there had, in fact been any site work done on the subject property before issuing the check.

54.    There also were two intended payments to JOHN VRATSINAS COMMERCIAL BUILDERS INC., dba JVC BUILDERS (hereafter "JVC") for $68,420 and $72,580 for "Consulting" and for "Site Work" when in fact, on information and belief; no construction work had been done on the subject property so no fees for consulting and site work were due.

55.    Once again, on information and belief, the defendant bank made no effort to verify whether there had, in fact, been any site work and consulting work done on the subject property or whether there had been any construction work done on the subject property before authorizing these payments.

56.    On information and belief, draws against the construction loan ceased until January 11, 2008, because the bank became suspicious about the way MICHAEL STESSMAN was handling the payouts through the LLC account to the intended payees.

57.    On January 11, 2008, the defendant bank caused to be deposited to the LLC account the sum of $195,269.90 to be applied against the total draw requests of draw number 13, in the amount of $375,524.

58    On information and belief, defendant bank caused MICHAEL STESSMAN to deposit to the LLC account the sum of $179,710.00 in order to fund the draws; on information and belief, the STESSMAN deposit was mandated by bank as a condition to resuming draws after bank became aware, sometime after October 5, 2007, that draw requests deposited to the LLC account had been diverted by MICHAEL STESSMAN to other purposes unrelated to the Fox Lake project including, on information and belief, an InPlay development, project in Des Moines, Iowa, an InPlay development in Peoria, Illinois and a development he was working on with TIEMANN in Nebraska, some of which projects had bank accounts with the defendant bank and had loans being administered by the same individual or individuals working with STESSMAN on this loan with the plaintiff LLC.

59.    All disbursements on this and subsequent draw requests were made by defendant bank directly and charged to the LLC checking account.  On information and belief, bank assumed the disbursement responsibility because it had become aware of defalcations and misappropriation of funds by MICHAEL STESSMAN.  Defendant Bank failed to notify any other representative or member of Fox Lake Lifestyle Development, LLC, of the actions by

MICHAEL STESSMAN and that MICHAEL STESSMAN had misappropriated drawn funds for his own use and benefit and had failed to pay drawn funds to the intended recipients.

60.     Defendant bank issued payment in the total amount of $256,539.96 to TIEMANN CO. and charged that disbursement against the LLC checking account.  Included in the total draw request amount were intended payments to TIEMANN CO. for $54,539.96 for construction work, and $203,000 for building construction "down-payment".

61.     Again, however, no construction work had taken place on the subject property and no contractor's or subcontractors sworn statements were submitted or required in order to support the draw request to TIEMANN.

62.     Again, on information and belief, the defendant bank made no effort whatsoever, to verify whether any construction activity had taken place on the subject property to justify these expenditures before authorizing them.

63.     On February 8, 2008, the defendant bank authorized construction draw number 14 in the amount of $342,997.58.

64.     Included in this amount were intended payments of $22,800 for "General Conditions" (not explained), $5,576 for "Administration" and $262,000 for "building."

65.     No building was going on at the site so these charges were, on information and belief, not legitimate.  $290,376.00 was disbursed to TIEMANN CO. by defendant Bank by Bank Iowa check 021615 dated 2/11/08, which was charged to the LLC account and the loan. The entire disbursement was allocated to the "Dry Stack" construction component of the project, but there was absolutely no Dry Stack construction whatsoever.

66.    Once again, on information and belief, the defendant bank made no effort to determine whether these charges were justified.

67.    On March 19, 2008, the defendant bank issued draw number 15, in the amount of $127,007.36.

68.    This draw included intended payments in the amounts of $32,000 for "General Conditions" (unexplained), $5,576 for Administration, and $4,000 for "appraisal" (unexplained).

69.    There is no explanation why there would be administration charges when there was no construction activity going on, there was no explanation of what "General Conditions" was or why it was being charged and why an appraisal was needed months into the project.

70.    Once again, on information and belief, the defendant bank made no effort to determine whether these charges were justified.

71.    On April 18, 2008, the defendant bank issued draw number 16 in the amount of $106, 372.39.

72.    This draw included an intended payment to of $101,503 in settlement of a lawsuit with JVC for construction work allegedly done on the job site.

73.    In fact, on information and belief, JVC did not perform the work they sued for and they were not entitled to the money they were paid in settlement.

74.    Once again, on information and belief, the defendant bank made no effort to determine whether these charges were justified.

75.    On July 22, 2008, the defendant bank issued draw number 19, in the amount of $334,817.88.

76.    This draw included an intended payment in the amount of $151,000 to Roof and Rack for construction of the Roof and Rack system dry stack boat storage system based not on a contract but a document labeled "invoice" from Roof and Rack Products allegedly directing payment to Tiemann Company in Nebraska which said that $237,200 was "due at start of fabrication" so it didn't match the number requested. That invoice was based on an attached "proposal" from Roof and Rack.

77.    It wasn't really clear from the documents whether the money was supposed to go to Roof and Rack directly or to go to TIEMANN. On information and belief, it went to TIEMANN CO.

78.    Roof and Rack only received a total of $18,000 on the project which barely covered the cost of the bid, and on information and belief TIEMANN retained all other funds set forth in the TIEMANN billing allegedly for Roof and Rack.

79.    Once again, on information and belief, the defendant bank made no effort to determine whether this charge was justified or who was really supposed to get this money. They made no effort to even determine if the invoice was tampered with or whether Roof and Rack really did want TIEMANN CO. to get paid instead of them.

80.    Also included in this draw were payments of two line items designated, "Admin Project Supervision" and charged at $2,750 each. Again, it is not clear for what since there was no construction work being done on the subject premises.

81.     It also included payment to the Harrod Law Firm to file an appearance or otherwise answer a second complaint filed by JVC against the LLC claiming an additional $194,000 was owed them by the LLC for further construction work.

82.     The Harrod law firm was paid $2,000 out of draw number 19 for this service.

83.     Nevertheless they did not file an appearance or answer until a default judgment was entered against them, one that the LLC has not yet been able to get vacated and removed, causing the LLC to have to eventually come up with another $194,000 that on information and belief JVC is not entitled to because there hasn't been any construction activity going on at the construction site.

84.     Once again, on information and belief, the defendant bank made no effort to determine whether these charges to the Harrod Law firm were justified or owed.

85.     Also included in this draw was payment for two "General Conditions" in the amount of $11,250 each (twice) without explanation of what that was or what it was for.

86.     Once again, on information and belief, the defendant bank made no effort to determine whether these charges were justified.

87.     At some point during this process, TIEMANN, on information and belief, had been paid a total of $829,,675.96  for construction, of which $665,415.86 was for concrete and steel construction (exclusive of interest) for the construction of a "Dry Stack" boat storage unit which includes $151,000 designated to be paid to Roof and Rack for construction of the Dry Stack boat storage unit which Roof and Rack never received. On information and belief, at some point during 2008, TIEMANN converted money he was paid  to personal use claiming

that he was owed it for construction work, supervision and consulting work that on information and belief was not done for the plaintiffs at the plaintiff's site in Fox Lake by TIEMANN.

88.    His excuse was that he was owed money by the LLC.

89.    Once again, on information and belief, the defendant bank made no effort to determine whether these payments issued to TIEMANN were justified.

**C.    Suspicious Circumstances**

90.    On information and belief, following the draws of October 5, 2007, and prior to the draw resumption in January of 2008, the defendant bank became concerned with the withdrawal activity on this bank loan account.

91.    On information and belief, the bank demanded that MICHAEL STESSMAN, return $179,710 to the bank which he did by deposit dated January 4, 2008. On information and belief, he obtained this money from a $216,000 deposit he made into an InPlay account at the defendant bank.

92.    However, on information and belief, that check could not clear because STESSMAN did not have sufficient funds in his account to make it clear. It was reversed out on January 14, 2008.

93.    On information and belief, STESSMAN thereby hatched a plan to put the money back without actually putting the money in the defendant bank.

94.     On information and belief, he convinced defendant TIEMANN to cause a wire transfer of funds to be made on January 15, 2008 the amount of $216,000 into an InPlay account at the defendant bank.

95.     On information and belief, STESSMAN paid TIEMANN back out of a draw from the defendant bank on February 8, 2008 in the amount of $262,000, which was allegedly for construction which was never done and did not and does not now exist.

96.     On information and belief the defendant bank was suspicious of STESSMAN and after the October 2007 draw, stopped all draws. When they resumed issuing draws in January of 2008, on information and belief, the bank continued to pay out to contractors and subcontractors without sufficient proof or evidence that the work was being done or had been done,  but on information and belief, the checks were written out to the contractors and subcontractors directly including TIEMANN CO at STESSMAN'S direction and requests.

97.     In addition,  the defendant bank paid out a total of $665,415.86 for concrete and steel (exclusive of interest) for the construction of a "Dry Stack" boat storage unit and no such building has ever been built on the plaintiff's site.

98.     On information and belief, the money was in TIEMANN'S hands and he converted it to his own use and to pay for projects he was working on in Nebraska with STESSMAN and or may have been working on with STESSMAN in Des Moines (an InPlay facility), and another InPlay facility in Peoria Illinois.

**D.     False Statements to Banking Regulators About the LLC Loan**

99.    By the fall of 2008, the LLC was unable to make its interest payments on the loan.

100.    In November of 2008, Jon Hart, the loan officer responsible for the loan became active in contacting Larry Conneally who by this time had replaced STESSMAN as the General Manager of the LLC, about asking if they could talk about the loan's future.

101.    By November of 2008, the defendant bank was threatening to foreclose on the loan.

102    However, during an inspection of the bank by banking regulators in December of 2008, the bank listed the subject loan with the LLC as a performing loan when they admitted to plaintiff's representatives in a meeting held at the defendant bank on January 2, 2009, a meeting that included Iver Johnson, Gary Meyers, Jon Hart, and James Langin, that they knew at the time, the subject loan was non-performing and had not officially been classified as such.

103    The bank passed inspection by the banking regulators with the bank making this misrepresentation of the loan classification of the subject loan in violation of  Iowa Code § 524.1605 which directs that "Any director, officer or employee of a state bank who shall knowingly subscribe or make any false statements or false entries in the books, records, or memoranda of a state bank, or knowingly subscribe or exhibit false papers with intent to deceive any person authorized to examine its condition, or shall knowingly subscribe or make false reports . . .  or who commits any other act with intent to defraud . . . any other person shall be guilty of a class "C" felony, and shall be forever disqualified from acting as a director, officer or employee of any state bank."

104    On information and belief, the defendant bank misled examiners and bank regulators during the December inspection by misclassifying other non-performing loans as performing loans to aid them passing inspection.

### E.    The SHERIFF OF LAKE COUNTY and JOHN VRATSINAS INDIVIDUALLY, and JOHN VRATSINAS COMMERCIALBUILDERS INC., dba JVC BUILDERS

105.    JOHN VRATSINAS individually and JOHN VRATSINAS COMMERCIAL BUILDERS dba JVC BUILDERS as a corporation are in bankruptcy. However they obtained permission from the bankruptcy court to lift the stay and file suit against the plaintiff LLC, and seek money for construction services that on information and belief he didn't perform for money he wasn't entitled to and obtained a default judgment against the LLC in the amount of $194,000 because, again on information and belief, STESSMAN told the lawyer he hired, he did not have to appear in court on the matter.[1]

106.    In the first lawsuit, JVC managed to obtain, on information and belief, an unauthorized settlement from the bank in the amount of $101,503 as indicated in paragraph 72 above.

107.    In a second lawsuit where the bankruptcy stay was lifted, JVC managed to get a default judgment against the plaintiffs when the law firm hired by STESSMAN, the Harrod law firm, allowed a default judgment to be entered and then they never properly vacated it.

---

[1] Counsel is not seeking to violate the automatic stay on any matter where the stay was not lifted by the bankruptcy court in this case. Counsel has only brought Vratsinas and JVC into this case in order to make them subject to plaintiff's motion for a TRO as a Sheriff's sale is scheduled in Lake County for April 17, and if that sale goes through, plaintiff's rights cannot be properly vindicated or adjudicated in this proceeding. That is also why plaintiff has added the Sheriff of Lake County as a party. Plaintiff is not seeking money damages against Vratsinas or JVC in this proceeding - just a stay of the Sheriff sale until this lawsuit and plaintiff's rights can be resolved. Othewise plaintiff will suffer irreparable harm and no adequate remedy at law will exist.

108.     As a result a judgment in the amount of $194,000 was entered against the plaintiffs in that case as indicated in paragraph 83 above.

109.     JVC has had its lawyer schedule a Sheriff's sale against the subject property in April.

110.     If the Sheriff's sale proceeds, when the sale relates to a judgment that never should have been entered, before the rights of the parties are determined, the property could be sold out from under the plaintiffs without them having the opportunity to protect their rights and interest in the property, all as a result of the wrongful acts of MICHAEL STESSMAN and JVC individually and or together, in concert.

## COUNT I – CIVIL RICO

### AGAINST ALL DEFENDANTS EXCEPT THE LAKE COUNTY SHERIFF AND JVC

111.     Plaintiff adopts and realleges paragraphs 1-110 as if fully set forth herein.

112.     The defendants and each of them are "persons" within the meaning of 18 U.S.C. § 1961(3) of the Racketeer Influenced and Corrupt Organizations Act (RICO or the Act) in that they are individuals capable of holding a legal or beneficial interest in property, they are incorporated, and or unincorporated entities and/or individuals, and in some instances they are or were during the relevant time period, agents of principals acting within the scope of their employment and their actual or apparent authority and or employment.

113.     On information and belief, the defendants and each of them as persons,

            a.      utilized a pattern of racketeering activity or the proceeds thereof

b.    to infiltrate an interstate enterprise

c.    by (1) using or investing any income derived from the pattern of racketeering activity to acquire an interest in or to establish  (2) acquiring or maintaining an interest in or control of an enterprise through a pattern of racketeering activity; (3) conducting or participating in an enterprise's pattern of racketeering activity whether as an employee or an associate; or (4) conspiring to violate any of the above in violation of 18 U.S.C. §§ 1961 (1) (A), (B); 1962 (a)-(d), 1964(c).

114.    As a direct and proximate result of the acts described aforesaid, the plaintiff was injured in its business and or property on information and belief, by reason of the defendants utilizing a pattern of racketeering so as to affect an enterprise engaged in interstate commerce in any of the four prohibited respects set forth in paragraph 113 above.

115.    The defendants and each of them engaged in (1) a scheme or artifice to defraud or obtain money or property from the plaintiff by means of false pretenses, representations or promises through the use of false representations in construction loan draws; (2) through the use of the mails and or interstate wires for the purpose of executing the scheme; and (3) they had a specific intent to defraud either by devising, participating in or abetting the scheme all in violation of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud).

**MAIL FRAUD**

116.    In engaging in mail fraud, the defendants used the mails by using the mails, by intended mailings through the U.S. Post Office.

117.    They used the mails in furtherance of the scheme.

118.    The mails were used by people within the racketeering association to the plaintiff and to other members of the association.

119.    The communications in the mail were related to the scheme.

120.    To the extent the defendants did not actually participate in the communications, the use of the mails was reasonably foreseeable.

121.    The defendants possessed the necessary scienter and intent to defraud in using and communicating through the mails.

122.    Plaintiff suffered injury to their property through the use of communication through the mail.

123.    Through the use of the mail, the defendants and each of them (1) affected or attempted or conspired to affect interstate commerce in any way or degree by (2) the unlawful taking or obtaining of plaintiff's property through fear or under color of official right in violation of 18 U.S.C. §1951(a).

124.    The defendants and each of them engaged in the following acts of mail fraud:

mail fraud on the cash loan disbursements paid to parties for work that on information and belief they did not do on this project and or that they weren't entitled to, in violation of 18 U.S.C.§ 1341 as follows: on draw number three on May 31, 2007, payment of $100,000 for Holiday Inn plans and specs, $12,000 to GASA Engineering, $31,000 to the Nathaniel Group for Construction Management, $14,500 to DKA

Design; draw number four on July 18, 2007 to JVC for $69,420, for

Consulting; draw number six on August 20, 2007, to JVC

Builders for $34,710 for Consulting, $34,710 to the Nathaniel Group for

Consulting, $9,750 to an unspecified contractor for "Engineering,"

draw number seven, on September 7, 2007, $34,710 to the Nathaniel

Group for unspecified reasons, $29,425 for real estate taxes that were

never paid; on draw number nine on October 5, 2007, $34,710 to the

Nathaniel Group for unspecified reasons, $6,500 to an unnamed

contractor for "preliminary site work," $68,420 to JVC for

Consulting, $72,580 for Site Work; draw number 13 on January 11,

2008, to TIEMANN in the amount of $53,539.96 without specification

of purpose, payment of $203,000 for "building" without specification of

purpose; draw number 14 on February 8, 2008, for "General Conditions"

(not explained) for $375,524, payment of $22,800 for "Administration"

(not explained), payment of $262,000 for "Building" (not explained),

payment of $26,250 to an unspecified party for "Architectural;" draw

number 15, dated March 19, 2008, in the amount of $32,000 for

"General Conditions" (not explained), for $5,576 for "Administration"

(not explained), for $30,000 to an unspecified party for "Architectural,"

to Terracon for $4,700 (not explained), for $20,000 to an unspecified

party for "Engineering" (not explained), and another payment for

$7,127.50 to an unspecified party for "Engineering (not explained);

draw number 16 on April 18, 2008, to JVC Settlement, not explained in

the amount of $101,503; draw number 19 dated July 22, 2008, to Village

of Fox Lake, not explained for $2,212.50, to the Harrod Law Firm for

$2,000 (not explained), to Roof and Rack Systems for $151,000 when

that money was diverted to TIEMANN, for $2,750 and $2750 to

unspecified parties for "Administration" without explanation, for

$11,250 twice to unspecified parties for "General Conditions"

(unexplained), and for $ 25,010 to Midland Standard (unexplained); as

well as the misappropriations of money from the Fox Lake development

on 30517 committed by MICHAEL STESSMAN as articulated and set

out in paragraphs 42-44, 46-47, 48-50, 60-61, 90-98.

## WIRE FRAUD

125.    In engaged in wired by using wires in furtherance of their scheme.

126.    The wires were used by people within the racketeering association to the

plaintiff and to other members of the association.

127.    The communications over the wires were related to the scheme.

128.    To the extent the defendants did not actually participate in the communications,

the use of the wires was reasonably foreseeable.

129.    The defendants possessed the necessary scienter and intent to defraud in using

and communicating over the wires.

130.    Plaintiff suffered injury to their property through the use of communication over

the wires.

131.    Through the use of the wires, the defendants and each of them (1) affected or attempted or conspired to affect interstate commerce in any way or degree by (2) the unlawful taking or obtaining of plaintiff's property through fear or under color of official right in violation of 18 U.S.C. §1951(a).

132.    Defendants STESSMAN and TIEMANN engaged in the following acts of wire fraud:

wire fraud on the cash loan disbursements paid to parties for work that on information and belief  they did not do on this project and or that they weren't entitled to, in violation of  18 U.S.C.§ 1341 as follows: on draw number three on May 31, 2007, payment of $100,000 for Holiday Inn plans and specs; August 20, 2007,  $65,000 wired to Tip Top  on draw number six; and the $216,000 wire in from JAMES C. TIEMANN dba TIEMANN CO.dated January 15, 2008 to BANKIOWA to STESSMAN to replace and fund STESSMAN'S redeposit to the LLC's draw account in the amount of $179,710 in January of 2008 in violation of 18 U.S.C. § 1343.

**ADDITIONAL RICO VIOLATIONS**

133.    On information and belief, they engaged in financial institution fraud in violation of 18 U.S.C. § 1344 in the defendants' use of the defendant bank to, on information and belief, defraud the plaintiff and steal its money through phony construction draws and misappropriation of their money as more fully set forth in paragraphs 32-98 above.

134.    Obstruction of justice and obstruction of the plaintiff finding out about what really happened with their money committed by the defendant bank which changed its draw records to hide what had happened on the construction draws in violation of 18 U.S.C. § 1503.

135.    On information and belief, obstruction of State or Local law enforcement and obstructing the plaintiff from finding out what happened with their money by the defendant bank by lying to State banking regulators about the status of the plaintiff's loan to pass inspection in violation of 18 U.S.C. § 1511 as set forth in paragraphs 99-104.

136.    Racketeering in violation of 18 U.S.C. § 1952.

137.    Falsified, concealed, or covered up material facts, made materially false, fictitious, or fraudulent statements or representation or made or used false writings or documents knowing the same to contain any materially false, fictitious, or fraudulent statements or entries to government banking regulators in violation of 18 USCS § 1001.

WHEREFORE, plaintiff prays for the following relief:

A.    Compensatory Damages.

B.    Treble Damages as permitted by RICO, 18 U.S.C. § 1964(c).

C.    Attorneys Fees pursuant to 18 U.S.C. § 1964 (c).

D.    Prejudgment interest pursuant to *Gorenstein Enters. v. Quality Care-USA*, 874 F.2d 431 (7th Cir. 1989) (Posner, J)

E.    Costs pursuant to Fed.R.Civ.P. 54 (d)

F.    Grant the plaintiff whatever other relief the court deems fit

## COUNT II

## BREACH OF FIDUCIARY DUTY AGAINST THE DEFENDANT BANKIOWA

## AND MICHAEL STESSMAN

138.    Plaintiff adopts and realleges paragraphs 1-137 and reiterates the same as if fully set forth herein.

139.    The defendant bank is a state chartered community bank.

140.    As such, it was chartered by the State of Iowa to act in a fiduciary capacity.

141.    As a fiduciary, the defendant has all the rights and duties which an individual has in such capacity under applicable law and under the terms upon which a state bank in the State of Iowa is designated to act in such capacity.

142.    In authorizing a state bank to act in a fiduciary capacity in Iowa, the Iowa State Superintendent may limit such authorization to such capacities as the superintendent deems appropriate.

143.    A state bank in Iowa may grant loans and extensions of credit to a corporate group in an amount not to exceed twenty-five percent of the state bank's aggregate capital if all loans and extensions of credit to any one borrower within a corporate group conform to the financial strength, assets, guarantee, or endorsement of any one corporate group member is not relied upon as a basis for loans and extensions of credit to any other corporate group member.

144.    A state bank in Iowa may grant loans and extensions of credit to a corporate group in an amount not to exceed thirty-five percent of aggregate capital if all loans and extensions of credit to any one borrower within a corporate group conform to the financial

strength, assets, guarantee, or endorsement of any one corporate group member is not relied upon as a basis for loans and extensions of credit to any other corporate group member.

145.    A corporate group as defined by Iowa law includes a person and all corporations in which the person owns or controls fifty percent or more of the shares entitled to vote. Iowa Code 524.904.

146.    In granting the loan in question to the plaintiff, the defendant bank did not follow these guidelines.

147.    The defendant bank did not properly assess the strengths, assets and sophistication of the plaintiff and its members and had they done so they would not have lent the plaintiff the money they did.

148.    The defendant bank also took personal guarantees from the individual members of the plaintiff LLC which they knew at the time were virtually worthless thus setting the plaintiff up for failure and foreclosure.

149.    1) a fiduciary relationship between the defendant bank and the plaintiff existed; 2) the defendant bank had a fiduciary duty to act with all due care, loyalty and integrity, honesty and responsibility toward the plaintiff at all times in conformity with that duty; 3) the defendant bank by lending the money to the plaintiff, by not properly managing the loan in question, by not properly supervising it, by continue to lend money when they knew something was wrong with the loan and how it was being administered, without engaging in the proper steps to manage the loan and verify that work was being done, breached that duty; and 4) damages occurred to the plaintiff as a direct and proximate result because of that breach of fiduciary duty which, as a direct result thereof, the defendant bank will profit in the transaction by foreclosing on the property involving the plaintiff to which the bank owed the duty; 4) defendant bank's conduct in its breach of duty has been willful and wanton and intentional as it

continued to lend money and continued to engage in its improper conduct even after it knew

the loan was going bad, that MICHAEL STESSMAN was engaging in shady practices and that

the loan was not being used for appropriate purposes.

150.    A fiduciary relationship existed between the plaintiff and MICHAEL

STESSMAN as STESSMAN was the general manager of the LLC.

151.    1) STESSMAN had a fiduciary duty to act with all due care, loyalty and

integrity, honesty and responsibility toward the plaintiff at all times in conformity with that

duty; 2) he had a duty not to convert any of the money from the bank loan for personal

purposes or use the money for any other projects other than the project in question; 3) by

having the bank use the proceeds of the loan to pay of his personal debts, by using the money

to divert the money to another project he and TIEMANN were working on in Nebraska, by

using the money for various other and sundry purposes other than the project in question, by

stealing and converting the money and not using it to engage in doing the construction work on

the Fox Lake site in question, defendant STESSMAN directly damaged the plaintiff as a direct

and proximate of his breach of duty which was willful and wanton and intentional.

WHEREFORE, plaintiff prays for the following relief:

A.    Compensatory Damages.

B.    Actual Damages

C.    Punitive Damages

D.    Prejudgment interest pursuant to *Gorenstein Enters. v. Quality Care-USA*, 874 F.2d 431 (7th Cir. 1989) (Posner, J)

E.      Costs pursuant to Fed.R.Civ.P. 54 (d)

F.      Grant the plaintiff whatever other relief the court deems fit

## COUNT III

### NEGLIGENCE AGAINST THE DEFENDANT BANKIOWA

152.     Plaintiff adopts and realleges paragraphs 1-151 and reiterates the same as if fully set forth herein.

152.     Defendant bank in holding itself out to the plaintiff as a construction loan lender, indicated that it was competent to handle a construction loan and its disbursements.

153.     The proper standard of care for a construction loan lender is to only disburse funds for construction purposes on the project in question.

154.     The proper standard of care for a construction loan lenders is to have a construction inspector on site to verify that requests for funds (draws) were legitimate,

155,      The proper standard of care for a construction loan lenders is to have an inspector on site to check to make sure material was on site and that the contractors were following construction plans,

156.     The proper standard of care for a construction loan lenders is to have an alternate on-site inspectors at the job site.

157.     The proper standard of care for a construction loan lenders is to have a supervisor of the on-site job inspector occasionally perform a review inspection to ascertain that inspections were reliable.

158.    The proper standard of care for a construction loan lenders is to, before disbursement of funds, loan administration, match inspection reports to draws.

159.    The proper standard of care for a construction loan lenders is to compare loan draws with construction plans to ensure that work was progressing accordingly.

160.    The proper standard of care for a construction loan lenders is to not repeatedly and continuously authorize cash disbursements directly into the LLC checking account.

161.    The proper standard of care for a construction loan lenders is to make checks payable on the draws jointly to the LLC and the supplier or subcontractors;

162.    The proper standard of care for a construction loan lenders is to compare paid bills and materialmens'lien wavers with draws to be certain that the loan funds were paying for actual expenses.

163.    The proper standard of care for a construction loan lenders is to compare progress from draws with construction plans to ensure that they were not funding cost overruns without due consideration;

164.    The proper standard of care for a construction loan lenders is to make sure that the lump sum draws matched the draw requests submitted by the LLC;

165.    The proper standard of care for a construction loan lenders is to require copies of contracts between the LLC and the intended payment recipients.

166.    The proper standard of care for a construction loan lenders is to require and receive sworn statements from contractors and subcontractors indicating that the work they were being paid for had in fact been done.

167.    The proper standard of care for a construction loan lenders is to ask for and receive construction progress photos.

168.    The proper standard of care for a construction loan lenders is to ask for and receive sworn or unsworn progress statements from any project manager or engineer.

169.    The proper standard of care for a construction loan lenders is to make on-site visits to the job site to verify that construction work is being performed as claimed.

170.    The proper standard of care for a construction loan lenders is to make not to regular draw deposits into the LLC account without any checks and balances and to see to it that the intended recipients were in fact being paid.

171.    The proper standard of care for a construction loan lenders is to follow regularly established banking procedures for disbursing the construction loan in question.

172.    The proper standard of care for a construction loan lenders is to not to lend money to the LLC based on personal guarantees of certain members which the defendant bank knew when they obtained them were virtually worthless.

173.    The proper standard of care for a construction loan lenders is to not to grant the loan even though they knew up front that the people they were lending to were unsophisticated and inexperienced in the field of real estate development;

174.    The proper standard of care for a construction loan lenders is to pay the contractors and subcontractors with joint party or two-party checks;

175.    The proper standard of care for a construction loan lenders is to do construction payout hold backs, holding back some of the payment to make sure the project manager or general contractor or owner is satisfied with the work before dispersing the final payment;

176.    The proper standard of care for a construction loan lenders is to pay the real estate taxes on the subject property directly or electronically, or when they paid it through third parties, didn't check to make sure the third parties had in fact, used the money to pay the real estate taxes as required;

177,    The proper standard of care for a construction loan lenders is not to, on information and belief, lie to bank examiners in December of 2008, and classified the subject loan as "performing" when they were calling representatives of the LLC in November of 2008, threatening to foreclose on the loan.

178,    As a direct and proximate result of the bank's deviation from this standard, the plaintiff was injured by the deviation from the standard.

WHEREFORE, plaintiff prays for the following relief:

A.    Compensatory Damages.

B.    Actual Damages

C.    Punitive Damages

D.    Prejudgment interest pursuant to *Gorenstein Enters. v. Quality Care-USA*, 874 F.2d 431 (7th Cir. 1989) (Posner, J)

    E.      Costs pursuant to Fed.R.Civ.P. 54 (d)

    F.      Grant the plaintiff whatever other relief the court deems fit

## COUNT IV

### THEFT AGAINST STESSMAN, TIEMANN, BANKIOWA

179.    Plaintiff adopts and realleges paragraphs 1-178 and reiterates the same as if fully set forth herein.

180.    As more fully set forth above, defendants STESSMAN, TIEMANN, VRATSINAS and BANK IOWA took money from the plaintiffs without being entitled to and without intent of returning it to which they were not entitled in the following particulars:

**TIEMANN**

181.    TIEMANN, on information and belief, had been paid a total of $842,876 for concrete and steel construction (exclusive of interest) for the construction of a "Dry Stack" boat storage unit and nothing has, to this day, ever been built on the subject property on site. On information and belief, at some point during 2008, TIEMANN converted this money to personal use claiming that he was owed it for construction supervision and consulting work that on information and belief has never been done for the plaintiffs at the plaintiff's site in Fox Lake by TIEMANN.

182.    The plaintiff is in need of an accounting from TIEMANN as he may have taken more than this amount and may owe the plaintiff even more.

**STESSMAN**

183.    Based on the work that plaintiff knows that STESSMAN did or did not do, and based on the draw history in the ledgers, on information and belief it appears that STESSMAN took a total of more than $624,967 including $361,175 in "debt retirement" where he had the bank pay off that much in his own personal debt as one of the first payments made on the construction loan.

## UNSPECIFIED "BUILDING" CHARGES

184.    There are also charges marked as "building" which are completely false because no building ever took place on site. These building charges which might have gone to STESSMAN or might have gone to TIEMANN total $465,000.

## BANKIOWA

185.    BANKIOWA completely botched this loan. They should be held responsible for the full total of the mismanaged and squandered loan in the amount of $5,219,731.51, plus interest charges.

WHEREFORE, plaintiff prays for the following relief:

A.    Compensatory Damages.

B.    Actual Damages

C.    Punitive Damages

D.    Prejudgment interest pursuant to *Gorenstein Enters. v. Quality Care-USA*, 874 F.2d 431 (7th Cir. 1989) (Posner, J)

E.    Costs pursuant to Fed.R.Civ.P. 54 (d)

F.    Grant the plaintiff whatever other relief the court deems fit

186.    Plaintiff demands trial by jury on all counts.

**Respectfully Submitted,**

**FOX LAKE LIFESTYLE DEVELOPMENT LLC**

**BY:        /s/: L. Steven Platt**

**L Steven Platt**
**ARNOLD and KADJAN**
**19 W. Jackson, 3rd Fl.**
**Chicago, IL 60604**
**(312) 236-0415**